UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MAUTAZ EZZAT, | * | |
|     Plaintiff, | * | |
| v. | * | Civil Action No. EA-22-2918 |
| AMERIGAS PROPANE, L.P., | * | |
|     Defendant. | * | |

MEMORANDUM OPINION

Plaintiff Mautaz Ezzat initiated the above-captioned action against AmeriGas Propane, L.P. (AmeriGas), on November 10, 2022, asserting breach of contract and related claims. ECF No. 1. Pending before the Court is AmeriGas's Motion for Summary Judgment. ECF No. 31. The motion is fully briefed (ECF Nos. 31–32, 34) and no hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, AmeriGas's motion is granted.

**I.      Background**

The dispute in this case centers on an agreement between Mr. Ezzat and AmeriGas for the supply of propane gas. Mr. Ezzat first purchased propane gas for his newly built residence in 1993 from Petrolane, a predecessor company of AmeriGas. ECF Nos. 31-2 at 6; 32-2 at 5.[1] The purchase was governed by a Residential Propane-Gas Service and Purchase Agreement. ECF Nos. 31-2 at 6; 31-3; 32-1. Mr. Ezzat is the sole shareholder of Maryland Custom Builders, a custom-home building company he founded in 1998. ECF No. 31-2 at 5–6. Mr. Ezzat testified at his deposition that "around 1998" he and an AmeriGas sales representative, Tom McLaughlin, reached an oral agreement that when Mr. Ezzat was building a home that was not serviced by a gas company, he would refer the client to AmeriGas in exchange for "cut-rate pricing" on the

---

[1] Page numbers refer to the pagination of the Court's Case Management/Electronic Case Files system printed at the top of the cited document.

supply of propane gas to Mr. Ezzat at both his residence and his vacation home at Deep Creek Lake, Maryland.  ECF Nos. 31-2 at 7–8, 14; 32-2 at 8.

As a result of that agreement, in 2000, Mr. Ezzat and an AmeriGas representative signed a Propane Supply Agreement and Equipment Lease and an Attachment E, a document incorporated into the agreement that specified additional terms.  ECF Nos. 31-2 at 7–8; 31-4; 32-2 at 6–7.  Mr. Ezzat testified at his deposition that Attachment E "was the result of the conversation that [he] had with [Mr.] McLaughlin" and Mr. McLaughlin's supervisor, and that this document memorialized the oral agreement between Mr. Ezzat and AmeriGas.  ECF No. 31-2 at 8, 14.  Each year, Mr. Ezzat and an AmeriGas representative would sign another attachment to the agreement that set out pricing for a specified term.  *Id.* at 9, 15; ECF No. 32-2 at 8.  For example, the Attachment A Price of Propane (Area Index) signed in December 2019 provided that from December 9, 2019, through November 30, 2020, the price per gallon of propane would be "the Company's local Area Index, plus $0.30, plus all applicable taxes, fees, and charges."  ECF No. 31-5.  Mr. Ezzat testified that he and Mr. McLaughlin had to "redo" the paperwork every year, "kind of like reconsummating the agreement every single year," because AmeriGas did not "have the ability to . . . keep it in the system indefinitely."  ECF No. 31-2 at 8–9.  Therefore, "right around Thanksgiving of every year [Mr. Ezzat] would reach out to AmeriGas and say, 'It's time to renew.'"  *Id.* at 10; ECF No. 32-2 at 9.  Mr. Ezzat testified that these annual "renewals" did not alter the parties' agreement, which is set out in the Propane Supply Agreement and Equipment Lease and Attachment E thereto.  ECF No. 31-2 at 11, 14–15.

In November 2020, Mr. Ezzat began "having problems with [his] account" and was being "grossly overbilled."  ECF Nos. 31-2 at 10; 32-2 at 9.  He had difficulty connecting with AmeriGas customer service.  ECF Nos. 31-2 at 10; 32-2 at 9.  In January 2021, Mr. Ezzat contacted AmeriGas to place an order for propane gas because his tank was "at less than five

2

percent." ECF No. 31-2 at 16.  AmeriGas informed Mr. Ezzat that his January 2021 fuel replenishment was cancelled because he "had a balance" and needed to "resolve [his] account" before propane could be delivered.  *Id.* at 16–17.  Mr. Ezzat contacted AmeriGas's billing department but could not reach a representative.  *Id.* at 16.  Eventually, he connected with a representative who advised him that to receive a propane gas delivery he "would have to prepay and pay a $250 emergency fill" charge and that the earliest delivery date would be within ten days.  *Id.* at 17.

At the end of January 2021, Mr. Ezzat ran out of propane gas.  ECF No. 31-7.  Mr. Ezzat testified that he used propane gas to fuel two furnaces, a water heater, a generator, and cooking appliances.  ECF No. 31-2 at 17.  He further testified that when the propane gas ran out, there was no heat in his home and that due to the lack of heat and the 15-to-20-degree weather outside, he, his wife, and their dogs were "shivering."  *Id.* at 18; ECF No. 32-2 at 10–11.  Mr. Ezzat cut up old furniture to light a fire and continued to call AmeriGas.  ECF Nos. 31-2 at 18; 32-2 at 10–11.  On February 1, 2021, Mr. Ezzat emailed an AmeriGas representative asking for a return call as soon as possible because he had been "totally out of fuel" since the day before.  ECF No. 31-7.  That same day, Mr. Ezzat drove to an AmeriGas location in Jessup, Maryland.  ECF Nos. 31-2 at 18; 32-2 at 12.  After explaining that his residence had no heat, an AmeriGas representative helped Mr. Ezzat load a 100-gallon tank into his truck and then accompanied Mr. Ezzat home, where they connected the tank at Mr. Ezzat's residence.  ECF No. 31-2 at 19.  AmeriGas made two additional propane deliveries to Mr. Ezzat's residence on February 2, 2021.  ECF Nos. 31-2 at 19; 31-8.

In February 2021, an AmeriGas representative informed Mr. Ezzat that "the powers that be . . . weren't amenable to extending this agreement any further."  ECF No. 31-2 at 10, 16; *see also* ECF No. 31-10.  This representative explained that AmeriGas could "no longer extend

commercial contracts to residential customers" and therefore it would not renew the agreement that had been in place. ECF No. 31-10; *see also* ECF No. 31-2 at 16. Eventually, another AmeriGas representative agreed to extend the agreement with Mr. Ezzat for another year and another attachment was executed, which was valid from January 1, 2021, through December 31, 2021. ECF Nos. 31-2 at 11; 31-6. In November 2021, Mr. Ezzat learned that AmeriGas was cancelling his reduced-price agreement. ECF No. 31-2 at 17.

On November 10, 2022, Mr. Ezzat filed the instant action, alleging breach of contract, unjust enrichment, promissory estoppel/detrimental reliance, and gross negligence claims, and seeking damages, a declaratory judgment, a permanent injunction, and reasonable attorney's fees and costs. ECF No. 1. On April 10, 2023, the Honorable Richard D. Bennett, the presiding judge at the time, granted AmeriGas's motion in part and dismissed all claims except for breach of contract.[2] ECF No. 9. Although Judge Bennett dismissed Mr. Ezzat's unjust enrichment claim without prejudice, Mr. Ezzat elected not to file an amended pleading to reallege that claim.

## II.     Discussion

Mr. Ezzat's only remaining claim is breach of contract. As a result of the alleged breach of contract, Mr. Ezzat seeks "compensatory, reliance incident damages, and/or specific performance." ECF No. 1 at 8. AmeriGas moves for summary judgment, arguing that there was no breach, and, in any event, that Mr. Ezzat has not established his entitlement to damages. ECF Nos. 31-1 at 2; 34 at 4. Mr. Ezzat contends that material issues of fact preclude summary judgment. ECF No. 32 at 6–11.

---

[2] This case was reassigned to the undersigned on December 11, 2023, after the parties consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rules 301 and 302. ECF Nos. 15, 20–21.

A. **Standard of Review**

Summary judgment motion practice "is properly regarded . . . as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Federal Rule of Civil Procedure 56 provides that the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, to defeat summary judgment, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.* v. *Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). On the other hand, summary judgment "is justified if, from the totality of the evidence presented, including pleadings, depositions, answers to interrogatories, and affidavits, the court is satisfied that there is no genuine factual issue for trial and the moving party is entitled to judgment as a matter of law." *Sylvia Dev. Corp.* v. *Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995) (citing Fed. R. Civ. P. 56(c)).

The Fourth Circuit has cautioned that summary judgment "cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits."

*Jacobs* v. *N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568-569 (4th Cir. 2015) (quoting 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 2728 (3d ed. 1998)).  At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In doing so, the district court "must view the evidence in the light most favorable to . . . the nonmovant[ ] and draw all reasonable inferences in [its] favor without weighing the evidence or assessing the witnesses' credibility."  *Baynard* v. *Malone*, 268 F.3d 228, 234-235 (4th Cir. 2001).

### B. Breach of Contract

In an action brought under a federal court's diversity jurisdiction, the court is to apply the substantive law of the state in which it sits.  *Mathis* v. *Terra Renewal Serv. Inc.*, 69 F.4th 236, 242 (4th Cir. 2023); *Lewis* v. *Waletzky*, 422 Md. 647, 657 (2011).  When analyzing contract claims, Maryland applies the law of the jurisdiction where the contract was made unless the contract contains a choice of law provision.  *Cunningham* v. *Feinberg*, 441 Md. 310, 326 (2015) (collecting cases).  Here, as discussed in greater detail below, the parties agree that the Propane Supply Agreement and Equipment Lease, Attachment E, and annually executed attachments are the operative contract documents.  *See supra* p. 2, *infra* p. 9.  Because these documents do not contain a choice of law provision, the Court will apply Maryland law.

Under Maryland law, a contract is formed when there is "mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration."  *Spaulding* v. *Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013) (internal quotation marks and citation omitted).  "Mutual assent" means that there was "an actual meeting of the minds regarding contract formation."  *Lopez* v. *XTEL Const. Grp., LLC*, 796 F. Supp. 2d 693, 699 (D. Md. 2011) (quoting *Cochran* v. *Norkunas*, 398 Md. 1, 23 (2007)).  Contracts may be oral or written, express

6

or implied.  *County Comm'rs of Caroline Cnty.* v. *J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94 (2000); *Dolan* v. *McQuaide*, 215 Md. App. 24, 35 (2013) (observing that "oral contracts" and "written contracts" are both considered "express contracts").  An "express contract" is "an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing."  *County Comm'rs of Caroline Cnty.*, 358 Md. at 94 (quoting BLACK'S LAW DICTIONARY 323 (6th ed. 1990)).  An "express contract speaks for itself and leaves no place for implications."  *Id.* (quoting *Klebe* v. *United States*, 263 U.S. 188, 192 (1923)).

Under Maryland law, "interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law" for the court to decide.  *Sy-Lene of Washington, Inc.* v. *Starwood Urb. Retail II, LLC*, 376 Md. 157, 163 (2003); *see also Gresham* v. *Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005).  When assessing a contract-related claim on a motion for summary judgment, the Fourth Circuit Court of Appeals has directed that the court must first "determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face."  *World-Wide Rts. Ltd. P'ship* v. *Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992).  If the court determines that "the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue."  *Id.*

A breach of contract is a "failure, without legal excuse, to perform any promise that forms the whole or part of a contract."  *Weaver* v. *ZeniMax Media, Inc.*, 175 Md. App. 16, 51 (2007) (citing 23 Richard A. Lord, WILLISTON ON CONTRACTS § 63:1 (4th ed. Supp. 2006)).  The elements of a breach of contract claim under Maryland law are (1) a contractual obligation and

7

(2) material breach of that obligation.³  *RRC Ne., LLC* v. *BAA Maryland, Inc.*, 413 Md. 638, 658 (2010); *Taylor* v. *NationsBank, N.A.*, 365 Md. 166, 175 (2001).  Ultimately, it is "the parties' agreement that . . . determines whether there has been a breach."  *Mathis* v. *Hargrove*, 166 Md. App. 286, 318-319 (2005).  Thus, understanding the contract's terms is key to determining whether the contract has been breached.

"Maryland follows the objective law of contract interpretation and construction."  *Taylor*, 365 Md. at 178.  This interpretive principle provides that "where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction" or use of extrinsic evidence.  *Wells* v. *Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251 (2001); *see also Clendenin Bros.* v. *United States Fire Ins. Co.*, 390 Md. 449, 459 (2006).  A contract's "plain meaning is determined by 'focus[ing] on the four corners of the agreement,'" not what the parties may have subjectively intended.  *Martz* v. *Day Dev. Co., L.C.*, 35 F.4th 220, 225 (4th Cir. 2022) (quoting *Cochran*, 398 Md. at 17) (alteration in original).  When the contract language is "plain and unambiguous," the Court must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated."  *Taylor*, 365 Md. at 178-179.

In support of his breach of contract claim, Mr. Ezzat alleges that he and AmeriGas agreed that his reduced pricing "shall continue each year in perpetuity," and that AmeriGas breached its contractual duty by cancelling Mr. Ezzat's propane fuel delivery and unilaterally terminating the reduced-price agreement.  ECF Nos. 1 ¶¶ 34–43; 31-2 at 20; 32 at 9–12.  Examination of the operative contract documents reveals that these allegations are either inconsistent with the contractual obligations or do not constitute a breach.

---

³ "It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages."  *Taylor* v. *NationsBank, N.A.*, 365 Md. 166, 175 (2001); *Hooton* v. *Kenneth B. Mumaw Plumbing & Heating Co.*, 271 Md. 565, 572 (1974).

8

Mr. Ezzat argues in his opposition to summary judgment that there are disputes of material fact as to which contract governed the parties' agreement. ECF No. 32 at 6–9. A review of the summary judgment exhibits, however, clearly identifies the operative contract. The parties agree that Mr. Ezzat entered into an oral agreement with AmeriGas in or around 1998 and that this agreement was subsequently incorporated into a written document, the Propane Supply Agreement and Equipment Lease and Attachment E. *See supra* pp. 1–2. Indeed, Mr. Ezzat testified as much at his deposition. ECF No. 31-2 at 14 (Mr. Ezzat testifying that he and Mr. McLaughlin entered into an oral agreement in or around 1998); *id.* at 7–8 (Mr. Ezzat testifying that the Propane Supply Agreement and Equipment Lease and Attachment E were signed as a result of his agreement with Mr. McLaughlin); *id.* at 14 (Mr. Ezzat testifying that Attachment E memorialized the oral agreement between Mr. Ezzat and Mr. McLaughlin); *id.* at 8 (Mr. Ezzat describing Attachment E as "the crux of the case"). Each year, these documents were supplemented by another attachment that set forth pricing for a specified term. *Id.* at 8–9 (Mr. Ezzat testifying that a new Attachment A Price of Propane (Area Index) to the other documents was signed annually to "reconsummat[e] the agreement every single year"); *id.* at 15 (same); *see also* ECF Nos. 31-5 (Attachment A Price of Propane – Area Index); 31-6 (Re: Confirmation of Pricing Agreement – Please Keep This Letter). Simply put, there is no dispute regarding which documents set forth the parties' agreement. A review of the documents themselves further reveals that the agreed-upon terms are unambiguous.

With respect to the duration of the agreement, there is no language in the contract documents that reflects an agreement that the reduced pricing AmeriGas offered Mr. Ezzat would continue in perpetuity. To the contrary, the plain language of the documents limits the parties' agreement to a specified period of time. Paragraph five of the Propane Supply Agreement and Equipment Lease, entitled "<u>TERM</u>" states, in pertinent part: "The initial term of

this agreement shall be five (5) year(s)." ECF No. 31-4 ¶ 5. Attachment E to this agreement also reflects a five-year term. *Id.* at 3 ("At the conclusion of the five year contract, the customer may purchase the tank at the market value, remove the tank, or renew the contract."). The annually executed attachment to the agreement that set out the price per gallon of propane, had an even shorter duration. For example, the Attachment A executed by the parties on December 19, 2019, provides that the term for the propane gas pricing was less than one year (December 9, 2019, to November 30, 2020). ECF No. 31-5; *see also* ECF No. 31-6 (setting propane gas pricing for the period of January 1, 2021, through December 31, 2021). Further, paragraph four of the Propane Supply Agreement and Equipment Lease, entitled "<u>FEES, RATES, AND CHARGES</u>," states, in pertinent part:

> AmeriGas reserves the right to change its fees, rates and charges from time to time without prior notice. Customer acknowledges that AmeriGas's fees, rates and charges may vary depending upon the volume of propane purchased, Customer classification, ownership of equipment and competitive conditions.

ECF No. 31-4 ¶ 4. Thus, the operative contract language expressly contemplates that AmeriGas could change the amount it charged Mr. Ezzat for the supply of propane gas. The language of the contract is plain and unambiguous and therefore controls, regardless of Mr. Ezzat's subjective understanding or intent. Mr. Ezzat's assertion that the agreed-upon price reduction would last in perpetuity is further undermined by his own deposition testimony in which he stated that the specific pricing agreement had to be renewed each year. *See supra* pp. 2, 9. Because there was no contractual obligation for AmeriGas to provide reduced pricing to Mr. Ezzat in perpetuity, there can be no breach of the contract on this basis.

The contract documents also provide that AmeriGas could suspend supply and terminate the contract when certain conditions had been met. Paragraph 12 of the Propane Supply Agreement and Equipment Lease, entitled "<u>TERMINATION</u>," states, in pertinent part:

10

> Either Party may terminate this agreement at the expiration of the initial term, or at any time thereafter by giving the other party thirty (30) days prior written notice. AmeriGas may terminate this agreement at any time without prior notice if Customer fails to satisfy the terms and conditions of Customer's agreement.

ECF No. 31-4 ¶ 12. Paragraph four, in turn, provides in pertinent part that, "Customer agrees to pay AmeriGas's fees, rates and charges in effect on the date that propane is delivered or services are rendered." *Id.* at ¶ 4. Paragraph six, entitled "PAYMENT TERMS," further states, in pertinent part that "Customer agrees to pay all fees, rates and charges required by this agreement within ten days after the invoice date or on the due date show, whichever is later . . . . AmeriGas reserves the right to require Customer to pay for propane deliveries in advance or to pay a cash deposit." *Id.* at ¶ 6. This language is clear and unambiguous, and a reasonable person in the position of the parties would understand that AmeriGas reserved the right to terminate the agreement, either by giving thirty days prior notice or without any prior notice if Mr. Ezzat failed to satisfy the terms and conditions of the agreement, which include prompt payment.

     Mr. Ezzat acknowledges that the January 2021 propane delivery was cancelled because his account had a balance that he needed to satisfy before AmeriGas would supply more propane gas. *See supra* pp. 2–3. At his deposition, Mr. Ezzat testified that AmeriGas representatives advised him that he needed to settle his account balance before additional propane could be delivered. ECF No. 31-2 at 10 (Mr. Ezzat testifying that AmeriGas told him "If you want fuel, you're going to have to pay X amount, whatever it was."); *id.* at 17 (Mr. Ezzat testifying that AmeriGas told him that the "only way we can send you fuel, you would have to prepay and pay a $250 emergency fill and the soonest we can get you is within ten days"); *id.* (Mr. Ezzat confirming that AmeriGas had told him that he needed to resolve the balance on his account before he could receive more propane); *id.* (Mr. Ezzat confirming that the January 2021 propane delivery was cancelled "[b]ecause of invoices not being paid").

11

That Mr. Ezzat took issue with the billing rate and apparently had difficulty reaching a representative to resolve the issue to his satisfaction, *id.* at 10, 16–17, does not negate the fact that the contract terms allowed AmeriGas to unilaterally terminate the agreement if Mr. Ezzat did not satisfy the specified terms and conditions, which included prompt payment.  In a sales contract such as this where the entire purpose of the agreement is to structure the exchange of an item (here, propane gas) for payment, it strains credulity to suggest that failure to make timely payment does not constitute a failure to satisfy the terms and conditions of the agreement, particularly when the customer's obligation to promptly pay invoices appears in two separate places in the contract.  *See supra* p. 11.  Indeed, courts applying Maryland law have routinely found that failure to pay constitutes a material breach in a wide array of contracts.  *E.g.*, *Chelsea Woods Ct. Condo.* v. *Gates BF Inv., LLC*, No. 847, Sept. Term, 2021, 2022 WL 2467257, at *16-17 (Md. App. Ct. July 6, 2022) (failure to pay water and sewer invoices); *Shapiro Eng'g Corp.* v. *Francis O. Day Co.*, 215 Md. 373, 379 (1958) (failure to pay an installment on a building contract); *Atlas Container Corp.* v. *H. & W. Corrugated Parts, Inc.*, Civil Action No. WDQ-12-0475, 2012 WL 3240434, at *3 (D. Md. Aug. 2, 2012) (failure to pay for goods); *Sagent Tech., Inc.* v. *Micros Sys., Inc*., 276 F. Supp. 2d 464, 469 (D. Md. 2003) (same).  AmeriGas was therefore wholly within its rights under contract when it cancelled the January 2021 propane delivery and ultimately terminated its reduced-price agreement with Mr. Ezzat.  *In re Mile 4 Auto., Inc.*, Civil Action No. PM-08-13622, 2010 WL 1416520, at *6 (Bankr. D. Md. Apr. 1, 2010) (holding that the defendant "did not breach the Contract by subsequently refusing to make any future gasoline deliveries because it no longer had an obligation to perform under the Contract" due to the plaintiff's "failure to pay for the Deliveries in full within the time required by the Contract").

In sum, taking the evidence in the light most favorable to Mr. Ezzat and drawing all inferences in his favor, the undisputed facts fail to establish AmeriGas's breach of contractual obligations. It is therefore unnecessary to reach AmeriGas's arguments regarding damages.

**III.   Conclusion**

For the foregoing reasons, AmeriGas's Motion for Summary Judgment (ECF No. 31) is granted. A separate Order follows.

Date: September 12, 2024                             /s/
                                                     Erin Aslan
                                                     United States Magistrate Judge